# IN THE COURT OF APPEALS OF IOWA

No. 17-1317
Filed January 9, 2019


**UNITYPOINT HEALTH CEDAR RAPIDS d/b/a ST. LUKE'S HOSPITAL,**
    Plaintiff-Appellant,

**vs.**

**IOWA DEPARTMENT OF PUBLIC HEALTH, STATE HEALTH FACILITIES COUNCIL,**
    Defendant-Appellee,

**and**

**MERCY HOSPITAL CEDAR RAPIDS d/b/a MERCY MEDICAL CENTER,**
    Intervenor/Appellee.
_____


Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

A hospital appeals from the district court's decision on judicial review affirming the State Health Facilities Council's decision to grant a certificate of need to another nearby hospital, thereby allowing that hospital to establish its own open-heart surgical program.  **AFFIRMED.**

Rebecca A. Brommel and Douglas E. Gross of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Tessa Register and Heather L. Adams, Assistant Attorneys General, for appellee.

Edwin N. McIntosh and William J. Miller of Dorsey & Whitney LLP, Des Moines, for appellee intervenor.

Heard by Potterfield, P.J., Doyle, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**POTTERFIELD, Presiding Judge.**

UnityPoint Health Cedar Rapids, doing business as St. Luke's Hospital, appeals from the district court's ruling on judicial review affirming the State Health Facilities Council's decision to issue a Certificate of Need (CON) to Mercy Hospital Cedar Rapids,[1] which allows Mercy to establish its own open-heart surgical program in its Cedar Rapids hospital.

On appeal, St. Luke's maintains the Council's decision to grant the CON should be reversed because the Council's interpretation of the minimum utilization rule—found in Iowa Administrative Code rule 641-203.2(3)(a)(1)—as a guideline rather than a mandate is either erroneous, *see* Iowa Code § 17A.19(10)(c) (2015), or "irrational, illogical, or wholly unjustifiable," s*ee* Iowa Code § 17A.19(10)(*l*). Additionally, St. Luke's challenges whether some of the findings made by the Council are supported by substantial evidence in the record, *see* Iowa Code § 17A.19(10)(f), including some findings that are required by Iowa Code section 135.64 before a CON can be issued.

**I. Background Proceedings.**

In July 2015, Mercy sent a letter to the Iowa Department of Public Health advising it of the hospital's intention to offer open-heart surgery at its Cedar Rapids hospital. Mercy followed that letter by filing a CON application in August. In support of its application, Mercy asserted that each year, approximately 150 of Mercy's patients have to go outside the Mercy system for their cardiac surgery. In a later response to the department's request for more information, Mercy again

---

[1] The Iowa Department of Public Health is responsible for providing administrative support and advice to the Council. *See* Iowa Code §§ 135.62(1), .65, .66, .69.

asserted that it estimated a volume of 150 patients for cardiac surgical services, with a 2% growth projected each year following the initial year.

A public hearing on the application was held before the State Health Facilities Council on November 15, 2016. St. Luke's participated in the hearing as an "affected person" and spoke out against the granting of the CON. *See* Iowa Code § 135.61(1)(c) (including in the definition of "affected persons" "each institutional health facility . . . which is located in the geographic area which would appropriately be served by the new institutional health service proposed in the application").

At dispute in the hearing was whether the minimum utilization rule was a guideline to be used by the Council in reaching its ultimate decision or a mandatory requirement that the Council must not grant the CON unless Mercy projected at least 200 procedures annually. The rule, Iowa Administrative Code rule 641-203.2(3)(a)(1), states: "Adult cardiovascular surgical programs should project an annual minimum rate of over 200, or no approval shall be granted. Higher case loads over 200 per annum, are encouraged."

Before the hearing took place, legal counsel to the Council issued an email regarding the application of the rule. Counsel advised it should be considered discretionary, noting that the rule used both the terms "should" and "shall." Additionally counsel stated, "Interpreting the rule as a guideline would be in keeping with the Council's longstanding practice of applying utilization requirements in its administrative rules . . . as guidelines only and not mandatory requirements." Following counsel's email but before the CON hearing, St. Luke's

petitioned the Department of Public Health for a declaratory ruling on the proper interpretation of the rule. The department denied St. Luke's request.

Immediately following the public hearing, the Council voted 3-2 to grant Mercy's request for the CON.

In the written ruling that followed, the Council ruled that the minimum utilization rule

> should be interpreted as a guideline in light of (1) the Council's prior construction of this rule as guideline in approving a CON to an applicant which projected below 200 surgeries per year; (2) the totality of the language of the rule—which states programs *should* project a certain number of cases and that higher case loads are merely *encouraged*, not required—providing a discretionary approach to the utilization issue; and (3) the Council's longstanding prior interpretation of the utilization standards in chapter 203 as guidelines.

The Council found "that patients needing urgent cardiac surgery are waiting an average of four to nine days due to limited access to cardiac surgery in the community. Additionally, patients needing elective open heart surgery found wait times increase from 4.9 weeks in 2014 to 5.3 weeks in 2015." The increase in wait time "increased costs related to additional hospital stays, increased anxieties for the patients and their families, and potential loss of wages due to the inability to work." The Council also recognized that patient stress "is exacerbated by having to leave the Mercy system to receive care in a new health system." In making this finding, the Council noted that when St. Luke's requested a CON in 2014 to begin offering radiation therapy services—a service patients historically had to leave St. Luke's and go to Mercy for—the Council had granted its request, in part, because:

> St. Luke's cancer patients in need of radiation therapy must currently leave the facility and provider network, resulting in each patient being treated by a new set of health providers and supporting team

members from a different health care system. This movement between systems can result in delays, unnecessary costs, and duplication of testing and other services.

The Council's written decision included findings as to the necessary four factors contained in Iowa Code section 135.64(2)(a)–(d).

St. Luke's filed a request for rehearing, which the Council denied. St. Luke's then filed a petition for judicial review. After full briefing on the issues and a reported hearing, the district court affirmed the Council's decision to issue a CON to Mercy for its open-heart surgery program.

St. Luke's appeals.

## II. Score and Standard of Review.

"We review a district court decision on petition for judicial review pursuant to section 17A.19 for errors at law." *Greenwood Manor v. Iowa Dep't of Public Health, State Health Facilities Council*, 641 N.W.2d 823, 830 (Iowa 2002). "[O]ur review is limited to whether the district court correctly applied the law." *Id.* "To determine whether our conclusions are aligned with those of the district court, we look to standards of section [17A.19(10)]." *Id.*

## III. Discussion.

### A. Minimum Utilization Rule.

St. Luke's maintains the Council wrongly interpreted the minimum utilization rule when it decided it was a guideline rather than a mandate. Additionally, St. Luke's asserts that the Council has not been vested with the power to interpret the rule so we must review with the nondeferential, errors-at-law standard. *See* Iowa Code § 17A.19(10)(c); *see also Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 143 (Iowa 2013). St. Luke's maintains the district court erred when it utilized

the "highly deferential 'irrational, illogical, or wholly unjustifiable' standard" in reviewing the Council's interpretation. *See Iowa Dental*, 831 N.W.2d at 143 (quoting Iowa Code § 17A.19(10)(*l*)).

### 1. Standard of Review.

In *Birchansky Real Estate, L.C. v. Iowa Dep't of Public Health, State Health Facilities Council*, 737 N.W.2d 134, 136 (Iowa 2007), our supreme court considered whether the Council had been vested with the authority to interpret section 135.63—a statute dealing with CONs. The court determined the Council had been vested with the authority after considering the following:

> The Department[2] was expressly created by the legislature to, among other things, make the final decision on all CON applications. Iowa Code § 135.62(2)[(f)]. The Department is also statutorily mandated with the responsibility for adopting all rules "necessary to enable [the Department] to implement this division," including procedures and criteria for reviewing CON application. *Id.* § 135.72(1); *see also id.* § 135.62(2)[(f)](5).

*Birchansky*, 737 N.W.2d at 138 (third alteration in original).

Yet St. Luke's maintains we should determine the Council is not vested with the power to interpret Iowa Administrative Code rule 641-203.2(3)(a)(1), asserting *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 13 (Iowa 2010) changed the framework used to determine whether an agency has been vested with interpretative power. Additionally, St. Luke's argues that case law finding the Council is vested with the power to interpret other statutes does not require us to

---

[2] In *Birchansky*, our supreme court recognized, "The State Health Facilities Council, a division of the Iowa Department of Public Health, is charged with reviewing CON applications and deciding when a CON should be issued." 737 N.W.2d at 136 n.2 (citing Iowa Code § 135.62(2)(d)). The court then noted, "For simplicity, we will not distinguish the actions of the Council from the actions of the Department." *Id.* We do the same.

find the Council has the power to interpret the rule at issue here. *See Renda*, 895 N.W.2d at 13–14 ("[I]t is possible that an agency has power to interpret some portions of or certain specialized language in a statute, but does not have the authority to interpret other statutory provisions.").

We acknowledge *Renda* clarified the judicial framework for determining whether the legislature has clearly vested interpretive theory in an agency. *See id.* at 10–14. However, that clarification does not require us to find that the Council has not been clearly vested with the authority to interpret rule 641-203.2(3)(a)(1).

First, in *Renda*, the supreme court cited to its previous holding in *Birchansky* without overruling or casting doubting on it. *See Renda*, 784 N.W.2d at 12 (noting the court had previously concluded "that because the term was not defined in the statute and because the department must necessarily interpret the term in order to carry out its duties, the power to interpret the term was clear vested in the department and deference was therefore given, citing *Birchansky* in support). Second, the court's determination in *Renda* that "a grant of mere rulemaking authority" is not sufficient to establish the legislature intended to give the agency authority to interpret all statutory language does not cause us to question the holding in *Birchansky*, as the *Birchansky* court did not rely solely upon the agency's rulemaking authority to reach its decision. *Renda*, 784 N.W.2d at 13. In *Birchansky*, the court held that the that the authority of the department to make a final decision on all CON applications coupled with rulemaking authority demonstrated that the authority was clearly vested with the department to interpret an exception to the certificate of need requirements. *Birchansky*, 737 N.W.2d at 138.

The Council has been given both broad powers and specific duties regarding CONs. *See* Iowa Code §§ 135.64(1), (2) (listing the eighteen factors to be considered and the four findings that must be made by the Council before it issues a CON); 135.69 (providing the Council shall make the final decision on a CON application); 135.62(2)(f)(1)–(5) (enumerating the duties of the Council). Included in the Council's powers are the abilities to "[d]etermine and adopt such policies as are authorized by law and are deemed necessary to the efficient discharge of its duties" and to "[a]dvise and counsel with the director concerning the provisions of this division and the policies and procedures adopted by the department." *Id.* § 135.62(2)(f)(2). "Indications that the legislature has delegated interpretive authority include 'rule-making authority, decision-making or enforcement authority that requires the agency to interpret the statutory language, and the agency's expertise on the subject or on the term to be interpreted.'" *See Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 518–19 (Iowa 2012) (citation omitted).

We agree with the district court the Council had been clearly vested with the power to interpret rule 641-203.2(3)(a)(1). In reaching this conclusion, we note that we have reached the same conclusion before. *See Fox Eye Surgery, L.L.C. v. Iowa Dep't of Pub. Health*, No. 09-1679, 2010 WL 3324944, at *1 (Iowa Ct. App. Aug. 25, 2010) ("Because the council's review of CON applications is a matter vested within its discretion, we only reverse if the council's decision to deny the application was 'irrational, illogical, or wholly unjustifiable.'").

Thus, we review the Council's interpretation of the rule with the "highly deferential 'irrational, illogical, or wholly unjustifiable' standard." *See Iowa Dental*, 831 N.W.2d at 143

### 2. Merits.

Next, we review the Council's interpretation of the minimum utilization rule as a guideline rather than a mandate. The rule states, "Adult cardiovascular surgical programs should project an annual minimum rate of over 200, or no approval shall be granted. Higher case loads over 200 per annum, are encouraged." Iowa Admin. Code r. 641-203.2(3)(a)(1).

St. Luke's maintains the interpretation of the rule as a directive is irrational, illogical, and wholly unjustifiable because the use of the word "shall" in the rule is unambiguous and requires the Council to deny applications when the projected rate is less than 200. Alternatively, St. Luke's maintains that even if the rule is ambiguous, it is irrational, illogical, and wholly unjustifiable to interpret the rule as a directive because (1) the change in language of the rule in 1980 establishes the intent of the drafters to make it mandatory, (2) the purpose of the 200-minimum requirement is to ensure patient safety, and (3) the Council's precedent establishes it previously interpreted the rule to be mandatory.

Ambiguity can arise in two ways: "from (1) the meaning of a specific term; or (2) the overall meaning of a statute when its provisions are considered in their totality." *Miller v. Marshall Cty.*, 641 N.W.2d 742, 748 (Iowa 2002). And while we have often found statutory language to be unambiguous when the word "shall" is used, here, when considering the totality of the language of the rule, including the use of "should" and "shall" and "encouraged," we find the rule is ambiguous. *See,*

*e.g.*, *Allen v. Tyson Fresh Meats, Inc.*, No. 17-0313, 2018 WL 1099117, at *2 (Iowa Ct. App. Feb. 21, 2018) (listing authorities to support the proposition that statutory interpretation requires the determination that the use of "shall" means a necessity or a requirement).  Moreover, our supreme court has recently recognized "the ambiguity inherent in the word 'shall.'" *Iowa Supreme Ct. Attorney Disciplinary Bd. v. Attorney Doe No. 819*, 894 N.W.2d 1, 6 (Iowa 2016).  "[T]he use of the word 'shall' in legal rules has fallen into disfavor because it may indicate a mandatory or permissive rule." *Id.* at 5.

When "a statute is ambiguous, we must utilize the rules of statutory interpretation."  *Miller*, 641 N.W.2d at 748.  "The rules for construction of administrative rules are nearly identical to those for construction of statutes." *Hollinrake v. Iowa Law Enf't Acad., Monroe Cty.*, 452 N.W.2d 598, 601 (Iowa 1990).  "One difference is that it is the intent of the agency in promulgating the rule which provides the basis of construction."  *Id.*

St. Luke's relies upon the change in the language of the rule to show the intent of the drafters to make the rule mandatory.  *See* Iowa Code § 4.6(3) (providing that if a statute is ambiguous, the court may use the legislative history in determining the intent of the legislature).  In 1978, the rule was written as follows:

> A new cardiac surgical program should reasonably expect to attain an annual rate of 75 pump-assisted procedures within one year, 125 pump-assisted procedures projected for the second year, and then unless 200 such procedures can be projected within three years, no approval should be granted.  New cardiac surgical services should not be established if they will interfere with the level of efficiency of existing units.

Iowa Admin. Code 470-203.2(1)(e).  St. Luke's claims the change from "no approval should be granted," to the current language, "no approval shall be

granted," establishes an intent to change the rule from directory to mandatory. *See* Iowa Admin. Code r. 641-203.2(3)(a)(1) ("Adult cardiovascular surgical programs should project an annual minimum rate of over 200, or *no approval shall be granted.* Higher case loads over 200 per annum, are encouraged." (emphasis added)). But we cannot read that phrase of the amendment alone. As the district court stated:

> The amendment does not persuade the court that the Council intended to require itself to disapprove applications for cardiac surgical programs that project fewer than 200 procedures. If the Council intended to do that, it could have easily stated that programs "must" project over 200 surgeries per year, and that caseloads over 200 are required, instead of "encouraged."

As stated above, the rule was amended to its current version in 1980. Since then, on at least one occasion, the Council has granted a CON application when the applicant did not meet the 200-case threshold—treating the rule as a guideline rather than a mandate. In a 1988 decision, the Council granted St. Joseph Mercy Hospital's CON application to start an open-heart surgery program even though "[t]he Council recognized that the number of projected open heart surgeries annually, 162, is below the standard of a 200 procedure minimum." The Council stated it "recognized that the applicant used a very conservative utilization projection," but the Council did not make a finding that the hospital would actually perform 200 or more surgeries before it decided to issue the CON.

Finally, we consider St. Luke's argument that the 200-minimum rule is a mandate because performing 200 surgeries annually is linked to better safety for patients. We acknowledge that both St. Luke's and the University of Iowa—which took no position but did file information before the hearing as an "affected party"—

provided support for the position that clinical outcomes are better for larger cardiovascular programs. But this does not persuade us it is irrational, illogical, or wholly unjustifiable for the Council to take the rule into account as a guideline rather than interpreting it as a mandate. According to Mercy, all of the Iowa programs conducting open-heart surgery have received a two-star rating (out of a possible three), even though the various programs being rated complete anywhere from 72 to 739 procedures each year. Additionally, at least in the Cedar Rapids area, some open-heart surgeons are performing surgeries at more than one hospital, so while a particular program may be the site of only a small number of surgeries each year, the surgeon completing the surgery may still be performing a large number of surgeries.

Based on the foregoing, we cannot say the Council's interpretation of rule 641-203.2(3)(a)(1) as a guideline in considering whether to issue a CON is irrational, illogical, or wholly unjustifiable.

**B. Decision to Grant CON.**

Iowa Code section 135.64 outlines four findings the Council must make before issuing a CON. *See* Iowa Code § 135.64(2)(a)–(d) ("[T]he council shall grant a certificate of need for a new institutional health service . . . only if it finds in writing, on the basis of data submitted to it by the department, that . . . ."). St. Luke's asserts that though the Council made them, the findings are not supported by substantial evidence in the record, *see* Iowa Code § 17A.19(10)(f)(1), and the district court erred in finding they were so supported. Additionally, St. Luke's claims that because three of the necessary findings are not supported by the

record, the Council's decision to grant Mercy's CON application was "irrational, illogical, or wholly unjustifiable." *See id.* § 17A.10(m).

"When reviewing a finding of fact for substantial evidence, we judge the finding 'in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it.'" *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) (quoting Iowa Code § 17A.19(10)(f)(3)). That being said, "[e]vidence is not insubstantial merely because different conclusions may be drawn from the evidence." *Id.* "Our task, therefore, is not to determine whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence, viewing the record as a whole, supports the findings actually made." *Id.*

### 1. Section 135.64(2)(a).

The council found, "Less costly, more efficient, or more appropriate alternatives to the proposed institutional health service are not available and the development of such alternatives is not practicable." Iowa Code § 135.64(2)(a). In doing so, the Council relied upon "the significant waiting periods [patients are experiencing] prior to surgery, which result in additional costs related to hospital fees and transfer fees to a different hospital for cardiac surgery." The Council also based its finding on the fact that "approximately half of all patients diagnosed with heart disease in Cedar Rapids are treated at Mercy [Cedar Rapids] and that continuing to require patients to navigate two distinct health care systems to receive cardiac surgery is not an efficient or appropriate alternative."

St. Luke's disputes the credibility of the evidence Mercy submitted regarding wait times for cardiac patients. Mercy reported to the Council that patients in the "urgent" category[3] "should receive surgery within 48 hours" but due to access delays, are waiting an average of 5.8 days. Additionally, Mercy reported that the "average wait time for elective cardiac surgical cases has increased from 4.9 weeks in 2014, to 5.3 weeks in 2015." St. Luke's asserts that delay for "urgent" patients averages three days and eighteen days for "elective" patients. Additionally, St. Luke's offered a different reason for delay than scheduling accessibility. Dr. James Levitt, a cardiac surgeon who works for St. Luke's, testified that the "timing of [heart] surgery is very key" and the cardiac surgeon's job "is to offer [the patient] a good operation at a time when their risk is as low as I can get it before I take them to the operating room." In order to increase the patient's chance of a successful surgery, doctors will require them to stop taking certain prescriptions, quit smoking for a period of time, take care of certain dental needs that may otherwise result in dangerous bacteria being present in their body, and make sure their diabetes is under control—among other things.

It is not our role to determine the credibility of the evidence. *See Christiansen v. Iowa Bd. of Educ. Exam'rs*, 831 N.W.2d 179, 192 (Iowa 2013) ("The law is well-settled. It is the agency's duty 'as the trier of fact to determine the

---

[3] According to testimony offered at the hearing, there are nationally-defined guidelines for prioritizing heart surgeries. In the "emergent" category are those patients who "need surgery now. You send them to the operating room." Next is the "urgent" patients, which are those where "the patient is stable enough that they don't need to be rushed to the operating room, but it is urgent enough that the doctor says that it isn't safe for them to go home." The final group is referred to as "elective," and in that group the "patient is stable enough to go home from the hospital and monitored closely as an outpatient until that surgery can be scheduled."

credibility of witnesses, weigh the evidence, and decide the facts in issue.'" (citation omitted)). While the evidence offered by St. Luke's may support a different finding than the one the Council made, case law circumscribes our right to make a different finding. *See Pease*, 807 N.W.2d at 845 ("Our task, therefore, is not to determine whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence, viewing the record as a whole, supports the findings actually made."); *see also Burns v. Bd. of Nursing*, 495 N.W.2d 698, 699 (Iowa 1993) ("Because review is not de novo, the court must not reassess the weight to be accorded various items of evidence. Weight of evidence remains within the agency's exclusive domain.").

We agree with the district court that substantial evidence supports this finding.

### 2. Section 135.64(2)(b).

St. Luke's challenges whether substantial evidence supports the Council's finding that "[a]ny existing facilities providing institutional health services similar to those proposed are being used in an appropriate and efficient manner." Iowa Code § 135.64(2)(b). The Council determined current facilities are—and will continue to be—used in an appropriate and efficient manner because the number of open-heart procedures performed by St. Luke's rose from 265 in 2013 to 328 in 2015. Additionally, because of the changed standard of care regarding heart procedures in diabetic patients, "cardiac surgery utilization is projected to further increase."

St. Luke's maintains the Council failed to consider one of the guidelines regarding when the Council should allow the expansion of heart surgery-programs. *See* Iowa Admin. Code r. 641-203.2(3)(b)(1) ("There should be no additional adult

cardiovascular surgery units initiated unless each existing unit within two hours surface travel time is operating at a minimum of 350 open heart surgery cases per year."). It is undisputed that not all programs within two hours' surface travel of Cedar Rapids are operating at a minimum of 350 procedures. Moreover, St. Lukes argues if Mercy stops sending 150 surgeries out to those other programs each year, the number of surgeries completed by the nearby surgical units will decrease.

Rule 641-203.2(3)(b)(1) appears to provide 350 surgeries as a numerical measure for "appropriate and efficient manner," but we note that the rule is only a guideline—which St. Luke's does not dispute. According to Mercy, since a 2013 change in the standard of care for diabetic patients, the number of open-heart surgeries—as opposed to the placement of stents—is on the rise. Additionally, Mercy maintained that the numbers were expected to rise further because the "population of adults over 60 years old is increasing in Iowa, and diabetes is a risk factor for heart disease, and the age-adjusted prevalence of diabetes has increased 67—66.7 percent in the Midwest from 1995 to 2010."

We agree with the district court that substantial evidence supports this finding.

### 3. Section 135.64(2)(d).

St. Luke's challenges the Council's final necessary finding—"Patients will experience serious problems in obtaining care of the type which will be furnished by the proposed new institutional health service or changed institutional health service, in the absence of that proposed new service." Iowa Code § 135.64(2)(d). In reaching this conclusion, the Council again relied upon Mercy's evidence regarding patient wait times for heart surgery, resulting in increased hospital costs,

loss of wages, and stress. The Council also noted that the Heart Rhythm Society had proposed new guidelines that required any hospital that performs complex ablations—which Mercy does—to have an on-site open-heart surgery program. If Mercy did not receive the requested CON, its patients may experience trouble in the future regarding other procedures they were currently able to obtain at Mercy. Additionally, St. Luke's disputes the Council's reliance on one of its own prior decision, when it considered the "delays, unnecessary costs, and duplication of testing and other services" as part of the problems patients experience when deciding whether to issue the CON.

St. Luke's notes that of the patients who presented testimony to the Council, none "present[ed] any examples of patients whose care was compromised as a result of being transferred to St. Luke's for open heart surgery." But the question is not whether patients are receiving substandard or worse care when they transfer to St. Luke's. The question is whether the patients are experiencing problems in obtaining the care. Based on the evidence the Council found more credible, patients—whether they originate their care at St. Luke's or Mercy—are experiencing longer wait times, which results in a number of stressors and challenges for those patients and could ultimately result in patient death.

We agree with the district court that substantial evidence supports this finding.

### 4. Other Findings.

St. Luke's challenges Mercy's projection of 150 procedures annually, claiming the number was "pulled from thin air." We disagree. Mercy transferred for cardiac surgery 122 patients in 2012, 104 in 2013, and 117 in 2014. However,

it also transferred an additional number of patients each year with "severe disease with the intent that they received medical management prior to possible surgery." In 2012, an additional 28 patients were referred, in 2013 an additional 29 patients, and in 2014 an additional 23 patients. In 2015, Mercy projected a total of 140 patients would be referred out for cardiac surgery with an additional 56 patients referred with the intent they received medical management before surgery. And in fact, by the time of the hearing in 2016, Mercy was able to report that in 2015, it transferred 148 patients for cardiac surgery. Moreover, it is logical to assume more patients with heart issues would choose to originate their care at Mercy once the limit on cardiac services they may receive at Mercy is removed.

St. Luke's also challenges the Council's and the district court's "reli[ance] upon Mercy's claim that volume is not an accurate predictor of quality, because there are quality programs that perform fewer than 200 surgeries per year." Even if we agree with St. Luke's contention that studies show volume is a predictor of quality, it is unclear to what relief St. Luke's believes it is entitled. And while there appears to be a correlation between the volume of procedures and the quality of the program, Mercy's projection of 150 surgeries each year would make it one of the larger programs in Iowa.

Because the Council's findings are supported by substantial evidence in the record, its decision to grant Mercy's CON is not "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.10(m).

**IV. Conclusion.**

We agree with the district court that the Council is vested with the power to interpret rule 641-203.2(3)(a)(1) and its interpretation of the rule as a guideline is

not illogical, irrational, or wholly unjustifiable.  Additionally, the Council's necessary findings pursuant to Iowa Code section 135.64(2) are supported by substantial evidence in the record, and its decision to grant the CON is not irrational, illogical, or wholly unjustifiable.  We affirm the district court's ruling on judicial review.

**AFFIRMED.**